```
                    IN THE UNITED STATES DISTRICT COURT

                         FOR THE DISTRICT OF OREGON

STEVE M. WILSON,                )
                                )      Civil No. 06-620-MO
          Petitioner,           )
                                )
     v.                         )
                                )
SEELEY,                         )
                                )      OPINION AND ORDER
          Respondent.           )

     Nell Brown
     Assistant Federal Public Defender
     101 S.W. Main Street, Suite 1700
     Portland, Oregon 97204

          Attorney for Petitioner

     Hardy Myers
     Attorney General
     Jacqueline Sadker
     Assistant Attorney General
     Department of Justice
     1162 Court Street NE
     Salem, Oregon 97310

          Attorneys for Respondent

///

     1 - OPINION AND ORDER
```

MOSMAN, District Judge.

Petitioner brings this habeas corpus case pursuant to 28 U.S.C. § 2254 in which he seeks to challenge the legality of his state court conviction for Manslaughter in the First Degree. For the reasons which follow, the Amended Petition for Writ of Habeas Corpus (#26) is denied.

## BACKGROUND

On March 3, 1993, Oregon City police officers responded to a report of a domestic disturbance. Respondent's Exhibit 115, p. 8. According to the Presentence Report, as the police approached the residence, they "heard what sounded like hammering and muffled voices." *Id.* When they finally gained entry, petitioner's girlfriend, Marcia Mitchell, was lying on the floor injured. Mitchell's 13-year-old daughter, RM, was kneeling beside her crying. RM informed the police that petitioner "had come home drunk and was upset over money," and that petitioner "went wild and assaulted her and her mother." *Id.* According to RM, petitioner "had pounded her mother's head on the floor. . . ." *Id.* This was the hammering sound police had heard when they had first approached the residence. *Id* at 9.

When the police found Mitchell, she was unconscious and "[h]er eyes had rolled up into the back of her head. Her face and jaw area were badly swollen, and she had a fresh cut on her left wrist. . . ." *Id* at 8. She died the following afternoon, and the

2 - OPINION AND ORDER

resulting autopsy revealed twelve contusions and abrasions on her arm, eight such injuries on her legs, five bruises on her chest, fifteen cuts on her torso, a fractured Adam's Apple, fifteen facial injuries, and massive hemorrhaging inside her brain.  Trial Transcript, pp. 605-620.

When the police transported petitioner to jail from the scene of the crime, he told one of the officers that "[t]he dirty bitch stole my money."  *Id* at 224.  At the booking desk, petitioner informed the officer that Mitchell had sustained her injuries at another location when she fought with someone else.  *Id* at 226.  Petitioner also informed the police that he got angry with Mitchell because he had not given her permission to be in his apartment, and "All I did was slap her in the face once."  *Id* at 227.  He also told the officer, "My $200 is gone.  It was my tuition at school."  Petitioner then wrote out the following statement:

> I, Steve Wilson, came home about six a.m. from my friend's house.  When I walked in the door my girlfriend was very mad and was in a fight at her apartment.  I tried to talk to her.  But when I seen what she did to my stove, broke the top off of it, I started to bitch.  I then looked on my desk with all my college books.  She f---ed them up bad.  And my tuition was gone.  $200.  I screamed.  She said I was not going to get it because she was going to send her daughter to Pendleton because CSD was going to take her.  If the police would look at my hands and then look at her hands, they would see what happened.  Then look at her apartment windows and stuff.  Look at my desk, smell her breath, ask the schools about her daughter, not at school one year.  If you would just look at things you would see that I did not ask them to be there or did I do anything besides get mad.

*Id* at 230.

3 - OPINION AND ORDER

On March 11, 2003, petitioner was indicted in Clackamas County for Murder and Manslaughter in the First Degree as to Mitchell, and Assault in the Fourth Degree for striking RM. Respondent's Exhibit 102. He proceeded to a jury trial where RM, the only eyewitness, testified that petitioner came home from a bar, waking her up when he slammed the door entering the home. Trial Transcript, p. 467. According to RM's testimony, petitioner asked Mitchell about the location of some money. He then "got on her and started hitting her." *Id* at 468. When RM asked petitioner to stop, petitioner told RM to "shut up" and asked her, "Now do you want to watch your mom get beat again?" *Id* at 470. Petitioner hit RM in the head, and kicked her in the jaw. He then "got onto [RM's] mom and started hitting her." *Id.*

RM then witnessed petitioner throw the stove burners at Mitchell, and when Mitchell got up from the bed where she had lain, petitioner threw a knife at her. *Id* at 471. Petitioner told RM, "You guys have an hour to find the money or you guys are out of here." *Id* at 474. He then followed Mitchell into the bathroom, where she repeatedly told him that she loved him, and pleaded with him to "stop hitting and listen to me." *Id* at 473. At that point, petitioner began stomping on Mitchell's head, kicking her more than eight times. *Id* at 474. He then "pulled [Mitchell] over and started choking her with her bra" until the police arrived. *Id* at 475-76.

4 - OPINION AND ORDER

Margi Ann Fields, the tenant in the apartment directly above that of petitioner, testified that in the early morning hours of March 3, 1993, she was awakened by the slamming of petitioner's door located directly beneath her window. *Id* at 331. Petitioner sounded "very drunk and very mad." Id at 332. His speech was slurred, and he "was yelling where the f[---] is my money." *Id* at 332. He said this several times, and Fields heard Mitchell saying repeatedly, "I love you, Steve." *Id.* She heard things breaking, then everything went silent. The commotion resumed, and "[i]t just sounded a lot more violent like things were getting broke and he was yelling a lot louder. . . ." *Id.* Petitioner continued to yell regarding the whereabouts of his money. *Id.* Mitchell "was crying a lot and she just kept saying she didn't know and that she loved him." *Id.* Fields heard "stomping" sounds, "[l]ike a kid throwing a tantrum, like jumping up and down and throwing a fit." *Id* at 334. She heard six of these sounds. *Id* at 334-35. When Fields thought she heard petitioner directing his anger toward RM, she called the police. *Id* at 334.

Petitioner testified that Mitchell was suicidal, and that he used justifiable force against her to prevent her from killing herself. According to petitioner, Mitchell had threatened to kill

5 - OPINION AND ORDER

herself approximately one week earlier during an argument with RM.[1] *Id* at 796-97. He claimed that when he returned from a local tavern on the morning of March 3, he found Mitchell in the bathroom with a butcher knife. She was cutting her hair and told him that she had tried to kill herself. *Id* at 805. Petitioner testified that he ultimately wrestled the butcher knife away from Mitchell three times. He admitted choking her at one point to force her to drop the knife. *Id* at 815. He also admitted throwing the knife at her twice. *Id* at 811.

To support his suicide theory, petitioner's attorney elicited testimony on cross-examination from the physician who attended to Mitchell in the Willamette Falls Hospital Emergency room. The physician indicated that a laceration on one of Mitchell's wrists was of the nature of a self-induced wound because it was linear and paralleled the creases in her skin. *Id* at 530.

The jury convicted petitioner of the lesser charge of Manslaughter in the First Degree as to Mitchell, and Assault in the Fourth Degree as to RM. As a result, the trial court sentenced petitioner to 200 months in prison. Respondent's Exhibit 101.

Shortly after the imposition of this sentence, on June 23, 1994, petitioner filed a motion seeking a new trial based on newly

---

[1] RM verified this story, testifying that a week before Mitchell was killed, she and RM had argued, leading Mitchell to threaten to kill herself by standing in the middle of the highway. Trial Transcript, p. 478.

6 - OPINION AND ORDER

discovered evidence that Mitchell was, indeed, suicidal on the morning she was killed. Respondent's Exhibit 103, App. 3. A subsequent tenant in petitioner's apartment, Scott Ward, had discovered a handwritten note among petitioner's belongings. *Id* at 4. According to Ward's affidavit, the note was authored by Mitchell and revealed that she was unhappy with herself, couldn't stand seeing petitioner with other women, and intended to kill herself in petitioner's bed. *Id* at 8. However, Ward threw out the notepad containing the letter before he realized its importance. *Id* at 9. In lieu of the note, petitioner introduced Ward's affidavit in support of his motion for a new trial.

Petitioner also submitted an affidavit from Fields who asserted that "[her] recollection of the letter is that it stated that [Mitchell] loved [petitioner] and that he was not treating her right. The letter indicated that [petitioner] had never gotten over Julie. The letter stated she did not want to live any more and was going to kill herself." *Id* at 13.

Petitioner submitted a third affidavit from Marleise Ward who claimed to have read the note before its destruction. She attested that Mitchell was "putting herself down" in the note, accused petitioner of seeing another woman, and "said she was going to kill herself in his bed." *Id* at 15.

In response, the State presented the affidavit of Julie Ward, who was present when petitioner's apartment was being cleaned out.

7 - OPINION AND ORDER

She attested that Mitchell's letter expressed how tired she was of the way things were going, and "about the way [petitioner] was hurting her. . . ." *Id* at 28.  According to Julie Ward's affidavit, the letter stated, "You're going to be the death of me." *Id* at 28.  Julie Ward was of the opinion "that the letter was not suicidal in nature but [she was] able to see how others may interpret the letter that way.  [Her] impression of the letter is that the victim was in fear of physical injury." *Id.*

The trial court denied petitioner's motion for a new trial as follows:

> As far as the issue of due diligence, it doesn't appear from the evidence there was an investigation made with these witnesses that Mr. Wilson was acting to prevent a suicide and whether or not they had any information that would disclose such conduct on his behalf. . . . It seems to me that the defendant at this point has a note of questionable time, of questionable contents and it's suggesting there is information that would support his view that Ms. Mitchell was, on the evening of her death, acting to commit suicide and his conduct was as he claimed, preventing her from that act and as a result of that conduct she develop any supporting testimony prior to trial or during the course of the trial.  There is an absence of proof that a document referred to by the witnesses related to intended conduct of Ms. Mitchell on the night of her death and additionally there is an absence of proof that the information would change the probable outcome.

Trial Transcript, pp. 1084-85.

Petitioner took a direct appeal, but the Oregon Court of Appeals affirmed the trial court without opinion, and the Oregon Supreme Court denied review.  Respondent's Exhibits 108-109.

8 - OPINION AND ORDER

Petitioner next filed for post-conviction relief ("PCR") in Umatilla County where the PCR trial court denied relief on all of his claims. Respondent's Exhibit 121-123. The Oregon Court of Appeals affirmed the lower court without opinion, and the Oregon Supreme Court denied review. *Wilson v. Baldwin*, 201 Or.App. 529, 120 P.3d 927 (2005), *rev. denied* 340 Or. 201, 131 P.3d 195 (2006).

On April 18, 2007, petitioner filed his Amended Petition for Writ of Habeas Corpus raising nine grounds for relief. Respondent asks the court to deny relief on petitioner's claims because they are either procedurally defaulted, or were properly denied on the merits in state court decisions that are entitled to deference.

## DISCUSSION

### I. Unargued Claims.

In response to the Amended Petition, the State provides specific reasons as to why none of petitioner's grounds entitle him to habeas corpus relief. In response, petitioner has filed a supporting memorandum in which he elects to brief only the merits of Grounds Three, Four, Five, Six, and Eight.[2] The court has nevertheless reviewed petitioner's unargued claims on the existing record and determined that they do not entitle him to relief. *See* 28 U.S.C. § 2248 ("The allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas

---

[2] Ground Eight is argued in a footnote for purposes of preservation. *See* Memo in Support (#41), p. 13.

9 - OPINION AND ORDER

corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true.").

## II. The Merits.

### A. Standard of Review.

An application for a writ of habeas corpus shall not be granted unless adjudication of the claim in state court resulted in a decision that was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court's findings of fact are presumed correct, and petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

A state court decision is "contrary to . . . clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause, a federal habeas court may grant relief "if the state court identifies the correct

governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id* at 413. The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous. *Id* at 410. The state court's application of clearly established law must be objectively unreasonable. *Id* at 409.

When a state court reaches a decision on the merits but provides no reasoning to support its conclusion, the federal habeas court must conduct an independent review of the record to determine whether the state court clearly erred in its application of Supreme Court law. *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). In such an instance, although the court independently reviews the record, it still lends deference to the state court's ultimate decision. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

Petitioner asserts that the court should not lend any deference to the PCR trial court's decision because it improperly applied a preponderance of the evidence standard to his case. ORS 138.620(2) governs the burden of proof in Oregon's PCR proceedings, and requires only that "[t]he burden of proof of **facts** alleged in the petition shall be upon the petitioner to establish such **facts** by a preponderance of the evidence." ORS 138.620(2) (emphasis added). Oregon law does not require PCR courts to misapply any governing legal standards, and the PCR trial court did not do so in petitioner's case. The PCR trial court merely applied the

11 - OPINION AND ORDER

preponderance of the evidence standard to the facts of the case as it was required to do. The Supreme Court and the Ninth Circuit have concluded that litigants seeking to prevail in a PCR proceeding must prove the facts of their case by a preponderance of the evidence. *Holland v. Jackson*, 542 U.S. 649, 654 (2004); *Alcala v. Woodford*, 334, 862, 869 (9th Cir. 2003); *Davis v. Woodford*, 333 F.3d 982, 991 (9th Cir. 2003). The court therefore lends deference to the state court decisions as required by the Anti-Terrorism and Effective Death Penalty Act.

**B.    Analysis.**

1.    Ground Three: Jury Instruction Error.

Under Oregon law, "[a] person acting under reasonable belief that another person is about to commit suicide or to inflict serious physical self-injury may use physical force upon that person to the extent that the person reasonably believes it necessary to thwart the result." ORS 161.205(4). Petitioner argues that the trial court erred when it did not properly inform the jury of the State's burden regarding the use of force, and instead instructed the jury that the State only had to show that petitioner did not believe the victim was about to commit suicide.

The Oregon Uniform Criminal Jury Instruction for such a defense is as follows:

> The defense of reasonable force has been raised.
>
> Oregon law provides that use of physical force on another person that would otherwise constitute an offense is

12 - OPINION AND ORDER

> justifiable and not criminal under the following circumstance:
>
> A person acting under a reasonable belief that another person is about to commit suicide or to inflict serious physical self-injury may use physical force on that person to the extent that the person reasonably believes it necessary to thwart the result.
>
> The burden of proof is on the state to prove beyond a reasonable doubt that the defense of reasonable physical force does not apply.

Or. Uniform Crim. Jury Instr. No. 1127.

The instruction used by the criminal trial court consisted of the following:

> However, one may use physical force upon another if the person is acting under a reasonable belief that the other person is about to commit suicide or inflict serious physical self-injury. Under that circumstance a person may use physical force with the other person to the extent that the person reasonably believes it is necessary to thwart the result. The use of physical force upon the person that would otherwise constitute an offense is justifiable and not criminal under this circumstance.
>
> And the burden of proof is on the State to prove beyond a reasonable doubt that the defendant did not reasonably believe that [Mitchell] was about to commit suicide or inflict serious physical self-injury.

Trial Transcript, pp. 987-88.

Petitioner maintains that the instruction given in his case improperly shifted the burden of proof because it did not require the State to prove that he did not use physical force which he believed reasonably necessary to thwart Mitchell's purported suicide attempt. As a result, petitioner contends that the

instruction effectively placed the burden of proof on him to show that he reasonably believed his use of force was necessary.

Pursuant to the instruction given by the trial court, the jury could only have found petitioner guilty of Manslaughter if it concluded that he did not reasonably believe that Mitchell was going to commit suicide or subject herself to serious physical injury. As the jury obviously answered that question against petitioner's interests, the reasonableness of the force he used against Mitchell becomes irrelevant because whatever force was used, it was not used to prevent Mitchell from injuring herself.

In addition, petitioner's assertion that Mitchell was attempting to commit suicide on the night in question was flatly contradicted by RM, the only eyewitness to the crime. RM's version of events was verified by Fields, who heard (but was but was unable to see) much of what happened from her apartment directly above petitioner's.

Petitioner's assertion regarding Mitchell's suicidal nature is also contradicted by his own statements to the police on the day he assaulted her. He never mentioned that he was acting to prevent Mitchell's suicide, and instead informed the police that he was angry with Mitchell because she stole his money. At one point, he also told the police that Mitchell had sustained her injuries elsewhere, which is totally inconsistent with his later trial

testimony that he inflicted Mitchell's injuries only to prevent her suicide.

Even assuming petitioner's unconvincing assertion regarding Mitchell's purported suicide attempt is true, the amount of force he used against her far exceeded that necessary to prevent her death. Because petitioner's use of force was so clearly excessive, any error by the trial court pertaining to this instruction was harmless because it would not have impacted the jury's decision in light of the evidence adduced at trial. *See Brecht v. Abramson*, 507 U.S. 619, 637-38 (1993)(the harmless error standard in habeas corpus proceedings is whether the error "had substantial and injurious effect or influence in determining the jury's verdict").

    2.  <u>Ground Four: Motion for New Trial</u>.

Petitioner next asserts that the trial court violated his right to a constitutionally fair trial when it failed to grant his motion for a new trial based on Mitchell's letter. When the trial court denied petitioner's motion for a new trial, it did so in part because petitioner had not exercised due diligence in his investigation. Trial Transcript, 1083-84. In addition, the court placed an emphasis on the fact that "we have three witnesses that read a document that placed different views on it and don't appear to have a specific recollection of its content and the document has now been destroyed. There are I believe evident[iary] problems as to whether or not the witness[es] would be able to testify to their

15 - OPINION AND ORDER

belief of the content of the document and whether that would constitute a statement of Ms. Mitchell's then existing mental state." *Id* at 1084. The court went on to find that the note was "of questionable time, of questionable contents," and there was "an absence of proof that a document referred to by the witnesses related to intended conduct of Ms. Mitchell on the night of her death and additionally there is an absence of proof that the information would change the probable outcome." *Id* at 1085.

Under Oregon law, a motion for a new trial based on newly discovered evidence should not be granted unless: (1) the new evidence will likely change the result; and (2) the evidence could not have been discovered prior to the trial through the exercise of due diligence. *State v. Disorbo*, 54 Or.App. 877, 882 (1981). In this case, petitioner has not directed the court's attention to clear and convincing evidence to overcome the trial court's factual finding that he failed to exercise due diligence in his investigation.

In addition, even if the note had been discovered, preserved, and presented at trial, it would not have changed the outcome of the case. Petitioner was unable to prove that Mitchell authored the note near the time of her death. Petitioner and the State produced competing affidavits as to the meaning various people derived from the note, with one of those individuals attesting that it appeared Mitchell was afraid petitioner might harm her.

16 - OPINION AND ORDER

Moreover, petitioner was obviously not aware of the note when he assaulted Mitchell because he never mentioned it to anyone, nor did he testify to its existence during his trial. Because he was unaware that Mitchell had written such a letter, it played no part in his decision to use physical force against her on the morning of March 3, 1993, and therefore could not have been used to bolster his justification defense. Even assuming the letter could be introduced for this purpose, the force plaintiff used was clearly unreasonable, therefore any testimony pertaining to Mitchell's note would not have changed the way jurors viewed petitioner's actions. In fact, if the jurors believed Julie Ward's interpretation of Mitchell's letter (that Mitchell feared for her safety at petitioner's hands), they might have convicted him of Murder. For these reasons, the trial court was well within its discretion to deny petitioner's motion for a new trial.

  3. <u>Ground Five: Ineffective Assistance of Counsel</u>.

Petitioner next asserts that trial counsel was constitutionally ineffective when he failed to investigate and discover Mitchell's alleged suicide note prior to trial. The Supreme Court has established a two-part test to determine whether a petitioner has received ineffective assistance of counsel. First, the petitioner must show that his lawyer's performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 686-687 (1984). Second, the petitioner

17 - OPINION AND ORDER

must show that his lawyer's performance prejudiced the defense. The appropriate test for prejudice is whether the defendant can show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id* at 694. A reasonable probability is one which is sufficient to undermine confidence in the outcome of the trial. *Id* at 696.

The court is aware that the criminal trial court, when denying petitioner's motion for a new trial, concluded that the defense was not diligent in its investigation. Trial Transcript, p. 1085. However, the PCR trial court found that petitioner "presented absolutely no evidence to suggest that counsel could have located [Mitchell's] note prior to trial." Respondent's Exhibit 122, p. 6. Even assuming petitioner had carried his burden of proof at his PCR trial and shown that counsel failed to exercise diligence in his investigation, petitioner cannot demonstrate that such a failure prejudiced his defense. As discussed in Ground Four, *supra*, the discovery of the note would not have changed the outcome of his criminal trial in petitioner's favor. Accordingly, petitioner is not entitled to relief on this claim.

    4.   <u>Ground Six: Ineffective Assistance of Counsel</u>.

Petitioner also contends that counsel failed to adequately investigate and present evidence of Native American traditions in support of petitioner's justification defense. Specifically, he

18 - OPINION AND ORDER

argues that Mitchell's hair clippings supported his assertion that she was attempting to commit suicide.

During his PCR trial, petitioner offered his own testimony in support of this claim, as well as the testimony of an inmate of Native American descent, Delbert Witzraft. Petitioner and Witzcraft testified that hair cutting in the Native American tradition signifies mourning, new beginnings, and can sometimes be a precursor to suicide. Respondent's Exhibit 120, pp. 16, 31. The PCR trial court made the following factual findings regarding this claim:

> Petitioner's testimony regarding Native American rituals was not credible or persuasive. Delbert Anthony Witzraft's testimony regarding Native American rituals was not credible or persuasive. All of the testimony presented by petitioner regarding Native American rituals was not relevant to the issues in the underlying trial. If trial counsel had presented this testimony at trial, it would not have affected petitioner's case. Trial counsel presented ample evidence to show that the victim slashed her own wrists as a result of her suicidal behavior.

Respondent's Exhibit 122, pp. 5-6.

Petitioner fails to overcome the PCR trial court's factual findings by clear and convincing evidence. Taking these findings as true, counsel was under no obligation to present non-credible testimony. Petitioner is therefore unable to prevail on his ineffective assistance of counsel claim.

///

///

5.  Ground Eight: Unlawful Sentence.

For preservation purposes, petitioner argues in a footnote that his upward departure sentence violated the rules articulated in *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Blakely v. Washington*, 542 U.S. 296 (2004). *Apprendi* and *Blakely* do not apply retroactively to convictions, such as petitioner's, which became final prior to those decisions. *United States v. Sanchez-Cervantes*, 282 F.3d 664, 671 (9th Cir. 2002) (*Apprendi* not retroactive; *Schardt v. Payne*, 414 F.3d 1025, 1036 (9th Cir. 2005) (*Blakely* not retroactive). He is therefore not entitled to relief on this claim.

## CONCLUSION

For the reasons identified above, the state court decisions denying relief on petitioner's claims are neither contrary to, nor unreasonable applications of, clearly established federal law. Accordingly, the Amended Petition for Writ of Habeas Corpus (#26) is DENIED.

IT IS SO ORDERED.

DATED this __4th__ day of September, 2008.

                                         /s/Michael W. Mosman
                                         Michael W. Mosman
                                         United States District Judge